IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 9, 2025

## STATE OF TENNESSEE v. DEVAN SHEPHERD

**Appeal from the Circuit Court for Madison County**
No. 23-360-C          Donald H. Allen, Judge

_____

### No. W2024-01645-CCA-R3-CD

_____

Devan Shepherd[1], Defendant, was convicted by a Madison County jury of first degree felony murder, three counts of aggravated robbery, one count of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of life plus twelve years. On appeal, Defendant contends that the evidence was insufficient to support his convictions; that the trial court erred by granting the State's motion in limine to prohibit any discussion of Defendant's age at the time of the offenses; and that the trial court erred by not instructing the jury on defense of a third person. Following our review of the record and the parties' arguments, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TOM GREENHOLTZ, JJ., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Devan Shepherd.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Jody Pickens, District Attorney General; and Justin Prescott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] Defendant's name is spelled "Shepard" in his brief on appeal. We use the spelling in the indictment.

Defendant was indicted by the Madison County Grand Jury, along with two co-defendants, Justin Davion Rivers (Rivers) and Jordan Boykin (Boykin), for felony murder in the perpetration of attempted aggravated robbery, felony murder in the perpetration of aggravated burglary, first degree premeditated murder, three counts of aggravated robbery, one count of aggravated assault, one count of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony. The trial court severed Defendant's trial from that of his co-defendants. The following evidence was adduced at trial.

Very early on January 15, 2023, Wilbi Anton Maldonado was at Sixto Maldonado's apartment located at the Old Hickory apartment complex in Jackson. The two cousins were talking and drinking beer with Sixto's[2] three roommates, Edgar Garcia, Edgar's brother Carlos Garcia, and Christian Osorio.[3] They heard someone force the door open, and Wilbi saw three masked men with guns. The taller of the three men entered the apartment, and the other two stayed in the doorway. The taller man pointed a "big[,]" "high-caliber" gun at Wilbi's head and demanded, "Money. Money." The man punched Wilbi in the face, and Wilbi gave him twenty dollars.

Sixto wrestled with the man and tried to disarm him. The man "tried to fire at Sixto, but Sixto did not let him." Wilbi grabbed the man's neck and managed to remove the cartridge from his gun. They "fell sideways," and "Sixto was using the weapon to choke the suspect." Wilbi heard three gunshots from outside the door. One of the men at the door said, "Oh, sh[*]t," and then Sixto said to Wilbi, "I've been shot, cousin." The two perpetrators outside the apartment ran away, and the one inside "left crawling and [] holding his stomach."

Edgar[4] and Mr. Osorio had not been drinking beer that night. Edgar testified that his brother Carlos was "right by the door" when the men forced open the door. One of the men grabbed Carlos and pulled him outside while the man with "a big weapon" and a ski mask entered the apartment and demanded, "money, money." Edgar testified, "I didn't have anything at the time, all I had was my phone, so I gave him my phone." The other two men were also wearing ski masks and stood in or near the doorway. One of the men had a "small" gun that he was "pointing inside." Edgar could not see whether the third man had a gun. Edgar saw Sixto wrestle with the gunman inside the apartment. They fell onto the sofa. The gunman at the door fired shots, and Sixto yelled, "I've been hit, I've been shot."

---

[2] Because Wilbi and Sixto share a surname, we will refer to them by their first names in this opinion.

[3] The four surviving victims all testified through an interpreter.

[4] Because Edgar and Carlos share a surname, we will refer to them by their first names.

Mr. Osorio was in the kitchen when the taller gunman entered the apartment and demanded money. Mr. Osorio testified, "I didn't have anything so I gave my phone, and I didn't resist."

Carlos testified that when the men forced open the door, "one came in and grabbed [him] and pulled [him] outside, and [Carlos] was on his knees outside." Carlos said all three men had guns. One of the men who remained outside the apartment pointed a gun at Carlos' head. Carlos could not lift his head, but he heard a struggle inside and heard someone fall. The gunman inside the apartment was injured and yelling. When Carlos heard gunshots, he ran from the apartment to the parking lot. He did not see the men's faces because they were all wearing masks.

Jackson Police Department ("JPD") Officer Trent Lemons was dispatched to the scene of the shooting. When he arrived, he found a male who had been shot multiple times in the lower body. Officer Lemons applied a tourniquet to the man's right thigh. Officer Lemons observed a "long" trail of blood outside the apartment leading to another apartment building in the complex. JPD Officer Richard Flowers followed the blood trail from the "1300 building" to the "1400 building" and found two cell phones just outside the apartment building. The language on the cell phones was "in Spanish."

Inside the apartment, Investigator Kennis Shell observed "a pool of blood, a pair of orange tennis shoes, items turned over, blood sp[]atter on the wall indicating that a struggle had taken place" inside the apartment. He spoke to a resident of a nearby apartment, who stated that he heard several shots and looked out the window to see three individuals. One of the individuals was "saying, 'help[,]'" and the other two turned back to help him before "[a]ll three ran off."

JPD Investigator Kevin Mooney collected a spent 9-millimeter shell casing, a spent .380-caliber shell casing, and an "AR-style" 300 Blackout magazine loaded with twenty-nine rounds from the victims' apartment. He found a bullet hole in the floor of the apartment. Investigator Mooney also collected a pair of orange Jordan shoes in the apartment.

Investigator Shell obtained two security videos from the property management office at the Old Hickory apartment complex. One video showed a "Hispanic male running from the 1300 building to the building directly across from it, shortly followed by three individuals coming from the same building." One appeared to be limping. The other two individuals were running towards the front of the 1400 building. They returned and assisted the limping individual. One of the individuals was wearing orange shoes. According to Investigator Shell, another video showed the group of three individuals, one

- 3 -

wearing the same orange shoes and another wearing white shoes, "in the same . . . parking lot area and checking vehicles." All three appeared to be wearing masks.

JPD Investigator Ashley Robertson was responding to a call of a robbery and a shooting at the Old Hickory apartment complex when he was rerouted to the hospital, where a possible suspect had been taken for a gunshot wound to the leg. Investigator Robertson spoke with co-defendant Rivers in the emergency room and observed a "very bloody" wound to his leg. Rivers was not wearing shoes. Investigator Robertson did not know if Rivers arrived at the hospital without shoes or if medical personnel removed them. Rivers was about to be airlifted to Memphis for treatment of his injuries, so Investigator Robertson gave his business card to Rivers' mother. He then proceeded to the Old Hickory apartment complex.

When he arrived at the apartment complex, Investigator Robertson observed "the blood trail from where the suspects had fled from the scene" and spoke to other officers at the scene. He "wasn't out there very long" before he received information that "our two other potential suspects were at a residence at Tracewood." Investigator Robertson arrived at the Tracewood residence and "order[ed] the occupants [who] were still inside the house to come outside." Among the occupants who exited the house were Devondre Carroll, Jason Marillo, and Defendant. Defendant came out of the house wearing "multicolored" Croc shoes, and "he began walking away from where [officers] were directing everybody else and then immediately fled on foot."

Investigator Shell was viewing the apartment security videos when he was alerted that officers had located suspects at the residence on Tracewood and that one of the men had run from the residence. On his way to the address, Investigator Shell observed Defendant running. Investigator Shell gave chase on foot and apprehended Defendant, who was wearing a black and gray hoodie and no shoes. Boykin did not exit the house, so Investigator Robertson and another officer entered the residence, and Boykin came out from a back room inside the house.

Upon a search of the Tracewood home, Investigator Mooney found a loaded pink and white .380 Beretta handgun under a mattress and a .300 Blackout pistol[5] that was "[c]ompletely unloaded" and did not contain a magazine. He found a pair of white Air Force One shoes with blood on them in a closet. Another officer found a pair of "tie-d[y]ed . . . rainbow Croc" shoes with blood on them outside the residence.

---

[5] Investigator Mooney explained that the .300 Blackout was "a pistol technically" but that it "operates and looks like a rifle."

Investigator Robertson viewed the security videos and identified the white shoes worn by one of the masked individuals as matching the white Air Force One shoes found in Rivers' bedroom at the house on Tracewood. He also identified the orange shoes worn by another masked individual as matching the orange Jordan shoes found in the victims' apartment. Investigator Robertson believed the person wearing the white shoes in the video was Boykin and the person wearing orange shoes was Rivers.

Sometime around 8:30 or 9:00 a.m., JPD Officer Dina Morris responded to a call at a home on Woodberry Trail. A construction worker who was remodeling the home found a large amount of blood at the back door. Officer Morris found more blood in the kitchen and a spent .300 Blackout shell casing.

Investigator Robertson interviewed Defendant at the JPD with Defendant's mother present. Investigator Robertson confronted Defendant with information obtained through investigation of the incident, and Defendant admitted that he, Rivers, and Boykin had planned to burglarize vehicles at the Old Hickory apartments. While at the apartment complex, they observed one of the victims exit the apartment, and "they decided to do a robbery." Defendant stated that he had the pink and white .380 handgun and Rivers had the .300 Blackout rifle.

Forensic testing revealed that the .380 shell casing found at the crime scene was fired from the .380 semiautomatic handgun found at the Tracewood home. The .300 Blackout shell casing found at the home on Woodberry Trail was fired from the .300 Blackout rifle found at the Tracewood home. One of the bullets recovered from Sixto's body during autopsy matched the bullet test-fired from the pink and white .380 handgun.

Dr. David Zimmerman, a medical examiner, performed an autopsy on Sixto's body. Dr. Zimmerman noted two gunshot wounds. One of the bullets perforated the right chest muscle, fractured a rib, perforated the lung and diaphragm, and then fractured a vertebra. Dr. Zimmerman concluded this wound would have been fatal. Another bullet entered the left thigh, perforated several muscles, and exited the medial side of the left thigh. The same bullet then entered and exited the scrotum and entered the right thigh, where it passed through muscle and stopped. Dr. Zimmerman concluded that wound could have been fatal, but not "as quickly fatal as the gunshot wound" to the chest. Dr. Zimmerman recovered both bullets from Sixto's spine and leg. Dr. Zimmerman determined Sixto's cause of death was multiple gunshot wounds, and the manner of death was homicide.

Defendant testified that in the early morning hours of January 15, 2023, he was at a bowling alley with Rivers, "Xavier,"[6] and Rivers' family. They left the bowling alley

---

[6] Xavier's last name is not in the record.

sometime around midnight and went to Rivers' house. Later that night, they left Rivers' house to go "do a drug deal for Tino."[7] They went to the "Hartland Apartments." Defendant carried a firearm "[f]or [his] protection." When they arrived, Rivers knocked on the door, and someone inside answered the door and invited him in but told Defendant and Xavier to wait outside. They waited outside for three to five minutes. Defendant heard "rumbling" and then saw "the door swing open." Defendant saw Rivers "getting choked and beaten up." Defendant pulled out his gun, and someone ran out of the apartment. Defendant told the people inside the apartment to "stop, stop," but they did not, so Defendant fired his gun. Defendant heard gunshots, and he "kind of blanked out" and ran away. As Defendant was running away from the apartment, Rivers yelled out that he was shot. Defendant returned to help Rivers, and they ran from the apartment complex to an abandoned house. They then returned to Rivers' house. Defendant said he ran from police "[b]ecause [he] was scared."

Defendant said his version of events at trial was different from what he told police because Tino had threatened to kill Defendant and his family if he told police what happened. Defendant testified that on the night of the incident, he was "just following [Rivers]" and that he did not intend to rob or assault anyone or to commit a burglary. Defendant said he shot into the apartment because Rivers was "getting jumped[.]"

On cross-examination, Defendant explained that they wore masks because "[i]t's a young generation. Everybody wear[s] masks." He said that Rivers stole the rifle "when [they] broke into some cars." Defendant said he carried a 9-millimeter with him for the drug deal, but he "traded" it for Xavier's "pink [.]380" behind the abandoned house. He told Xavier to "get rid of" the 9-millimeter. Defendant said he had stolen the .380 handgun on a previous occasion.

At the close of the State's case-in-chief, the trial court dismissed the count of premeditated murder. The jury convicted Defendant as charged in the remaining counts. The trial court merged the felony murder convictions and imposed an effective sentence of life plus twelve years. The trial court denied Defendant's motion for new trial, and Defendant timely appeals.

## *Analysis*

### *Sufficiency of the Evidence*

Defendant contends that the proof at trial was insufficient to support his convictions. The State asserts that Defendant has waived consideration of this issue by failing to

---

[7] Tino's last name is not in the record.

adequately brief the issue and that the evidence was more than sufficient to sustain Defendant's convictions.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant broadly asserts "that the evidence was insufficient to support the jury's verdict of guilt on all counts." Beyond a statement of the law regarding the applicable standard of review for a challenge to the sufficiency of the evidence, Defendant's brief is lacking. Defendant fails to state the elements of the offenses for which he was convicted and merely asks this Court to accredit his testimony at trial. *See* Tenn. R. App. P. 27(a)(7) (requiring an appellant to present a brief which sets forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."); Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Despite Defendant's inadequate briefing, we will review the record for sufficiency of the evidence supporting Defendant's convictions.

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery [or] burglary. . . ." T.C.A. § 39-13-202(a)(2). Aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear accomplished with a deadly weapon. *Id.* §§ 39-13-401, -402. A person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with intent to commit a felony. *Id.* §§

39-13-1002(a)(1), -1003(a). As charged in the indictment, "[a] person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2). As relevant to this case, an assault is aggravated if it "[i]nvolved the use or display of a deadly weapon[.]" T.C.A. 39-13-102(a)(1)(A)(ii).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402. For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). Finally, "[i]t is an offense to employ a firearm during the commission of an aggravated burglary." T.C.A. §§ 39-17-1324(b)(1), (i)(1)(H).

In the light most favorable to the State, the evidence at trial showed that Defendant, Rivers, and Boykin, all three armed and masked, decided to rob the men in Sixto's apartment. They forced open the door, and Rivers entered the apartment while the other two stood at the door and pulled Carlos Garcia outside and held a gun to his head. Rivers demanded money from the victims inside. He punched Wilbi in the face and took twenty dollars from him, and he took cell phones from Edgar and Mr. Osorio. Sixto attempted to disarm Rivers, and Defendant and Boykin fired shots into the apartment, killing Sixto. Defendant, Rivers, and Boykin then ran from the apartment complex and hid at an abandoned house before returning to Rivers' house. When police arrived at Rivers' house, Defendant ran. This evidence is sufficient to support Defendant's convictions for felony murder of Sixto Maldonado, aggravated burglary, aggravated robbery of Wilbi Maldonado, Edgar Garcia, and Christian Osorio, aggravated assault of Carlos Garcia, and employing a firearm during the commission of a dangerous felony.

Defendant asserts that he, "being the youngest and smallest" of the group, followed Rivers and "Xavier" to the apartments "with the understanding that Rivers was delivering drugs that night." Defendant asserts that "he only had a firearm for his personal protection" and that "he used the weapon for protection of another when he saw his friend getting attacked." However, the jury did not accept Defendant's version of events, and this Court

does not reconsider the evidence or reevaluate the jury's credibility determinations. Defendant is not entitled to relief on this issue.

*Motion in Limine*

Defendant contends that the trial court erred by granting the State's motion to prohibit defense counsel or any witness from mentioning Defendant's and his co-defendants' ages. The State asserts that Defendant failed to adequately brief the issue and that despite waiver, the trial court properly granted the State's motion.

Before trial, the State filed a motion seeking to prohibit any mention of the defendants' ages and argued, "the youth of the defendants does not tend to prove a material issue in this case." The State's motion was addressed on the first day of trial. Defense counsel asserted, "I just don't know that there's any way around it. It's part of the identification of clients." The trial court noted that Defendant was thirteen years old at the time of the offenses. The court granted the State's motion, finding that "the ages of each defendant" was not "relevant to any fact at issue in this matter." The trial court stated that its ruling prohibited any mention of the specific age of Defendant, but the court clarified, "if some witness testifies that the person appeared to be young or appeared to be a juvenile or whatever," the court would allow that.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. "To be relevant, evidence must tend to prove a material issue." *Id.*, Advisory Comm'n Cmt. When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion[.]" *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citations omitted). A trial court abuses its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

We again note the inadequacies in Defendant's brief on this issue. Defendant cites no legal authority other than pointing out that the State filed a motion to exclude evidence of Defendant's age pursuant to Tennessee Rule of Evidence 401, which defines "[r]elevant evidence." Moreover, Defendant fails to state any material issue to which his age was relevant at trial. Defendant argues the ages of the defendants "were just as important as identifying the defendants as their height was in this case." Defendant asserts that proof of his age tended to support the defense theory that he was a "follower." However, Defendant presented this theory to the jury, and the jury rejected it. Defendant has not

shown that the jury's verdict would have been different had the jury heard evidence of the defendants' specific ages.

Defendant's age was generally irrelevant to the facts at issue during the trial. The trial court did not abuse its discretion by excluding evidence of Defendant's age, and Defendant is not entitled to relief on this issue.

*Jury Instruction*

Defendant contends that the trial court erred by not instructing the jury on defense of a third person. The State asserts that the issue is waived because Defendant failed to include the jury instructions in the record on appeal.

The question of whether the facts in a criminal case require the jury to be instructed regarding a particular defense is a mixed question of law and fact. We review these questions de novo, with no presumption of correctness. *State v. Cole-Pugh*, 588 S.W.3d 254, 259-60 (Tenn. 2019).

A defendant has "'a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.'" *Cole-Pugh*, 588 S.W.3d, 259-60) (quoting *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004)). "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request." *State v. Benson*, 600 S.W.3d 896, 902 (Tenn. 2020) (citing *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)). "This obligation extends to general defenses, such as self-defense, defense of another, or defense of a habitation." *Hawkins*, 406 S.W.3d at 129 (footnote omitted). "[T[he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975) (citing *Poe v. State*, 370 S.W.2d 488 (1963)). An instruction is "'prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)).

The issue of whether a defense exists does "not [need] to be submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c). "The defendant has the burden of introducing admissible evidence that a defense is applicable." *Id.* § -203, Sentencing Comm'n Cmts. The Tennessee Supreme Court held that self-defense is a "general defense" and that "the quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129; *see Perrier*, 536 S.W.3d at 403. "When determining if a

- 10 -

defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." *Benson*, 600 S.W.3d at 903 (citing *Hawkins*, 406 S.W.3d at 129). When admissible evidence fairly raises a general defense, the trial court must submit the general defense to the jury, and at that point the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. *Hawkins*, 406 S.W.3d at 129; *see Perrier*, 536 S.W.3d at 403. If a defense instruction is submitted to the jury, "the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted." T.C.A. § 39-11-203(d).

At trial, defense counsel requested that the trial court instruct the jury on defense of another. Counsel argued that Defendant was in a place where he had a lawful right to be based on Defendant's testimony that he did not participate in the drug deal and was unaware of what was taking place inside the apartment. The State argued that Defendant was not entitled to the instruction because he was illegally in possession of a stolen firearm. The court declined Defendant's request for the instruction, ruling that Defendant cannot "claim a defense of a third person when he is committing a[n] illegal act, you know, and also, when he's in a place that he has no right to be."

The State asserts that Defendant has waived consideration of this issue by failing to include the jury instructions in the record on appeal. It is the duty of the appellant to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b). The failure to include a transcript of the jury instructions waives a challenge to the jury instructions. *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).

We agree with the State that Defendant has risked waiver by failing to include the jury instructions in the record on appeal; however, the transcript includes discussion about the issue and the trial court's ruling on the issue. Thus, we have some context within which to review the issue.

Defense of another is defined as follows:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

T.C.A. § 39-11-612.  Under this statute, "the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified." *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998).  In other words, "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *Id*.  We must consider whether the proof in this case fairly raised the possibility that Defendant shot the victim because he believed doing so was "immediately necessary" to protect a third person.

What is more, the legal principles that are required for self-defense, Tennessee Code Annotated section 39-11-611, must be justified before a defense of third person instruction would be allowed.  T.C.A. 39-11-612(1).  As in self-defense, courts do not get to the questions of "reasonable belief" and "immediately necessary" if a person is engaging in conduct that would constitute a felony or Class A misdemeanor and is in a place where they have no right to be.

Clearly, the record supports that Defendant was knowingly participating in a plan that put him in a place where he had no right to be, while engaging in an illegal drug transaction, an aggravated assault on Carlos Garcia, and while in the possession of a stolen weapon.  Defendant was both in a place where he had no right to be and engaged in felonious conduct at the time he claims third party defense.  The trial court did not err by denying the request for defense of third party instruction, and Defendant is not entitled to relief.

CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

S/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 12 -